# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 7, 2007

### STATE OF TENNESSEE v. DEMARCUS YOUNG
**Appeal from the Criminal Court for Shelby County**
**No. 04-04588    W. Otis Higgs, Jr., Judge**

---

### No. W2006-02440-CCA-R3-CD  - Filed October 30, 2007

---

The defendant was convicted by a Shelby County jury of aggravated robbery, a Class B felony, and sentenced to eight years in prison as a Range I, standard offender.  On appeal, the defendant contends that the evidence produced at trial was insufficient to support the jury's guilty verdict, and he also contends that the trial court committed plain error in admitting evidence of the robbery victim's identification of the defendant as the perpetrator.  After reviewing the record, we conclude that the evidence produced at trial was sufficient to support the defendant's conviction, and that the identification issue is waived on appeal.   Accordingly, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Robert Jones, District Public Defender; Phyllis Aluko (on appeal) and Robert Felkner (at trial), Assistant District Public Defenders, for the appellant, Demarcus Young.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; Patience Branham and Marianne Bell, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

At trial, Alioune Mbodj testified that on March 31, 2004, he reported to work at the 76 gas station and convenience store at the corner of Winchester Road and Millbranch Road in Memphis. Mr. Mbodj testified that he worked the 11:00 p.m. to 7:00 a.m. shift, during which time the store was locked and the store attendant would retrieve items for customers and pass their orders to them through a store window.  Mr. Mbodj stated that the common practice for the store's night attendants, a practice which he followed, was to place money, usually $20 bills and larger, in a drawer

underneath the cash register so that the register would never have more than $50 in it, which was store policy. Once the drawer accumulated $100, the clerk would place the money in a drop safe. He did this throughout his shift, with the exception of what would be his last drop; instead of placing the last deposit in the safe, he would keep that money in the drawer so that the clerk working the register after him would have enough money to place in the register.

Mr. Mbodj said that his routine whenever he worked the late shift was to finish up his shift around 6:00 a.m.; as part of his routine, he would place trash and boxes outside the front door, then return inside the store and lock the door. Once his relief arrived, Mr. Mbodj would take the trash to the dumpster. Mr. Mbodj testified that on the morning in question, he unlocked the store's door and placed boxes and trash outside the door, as he usually did. On this occasion, though, he was approached from behind by a man. Mr. Mbodj wanted to tell the man that the store was not open yet, but before Mr. Mbodj could do so, the man "violently" pushed him onto the ground. Mr. Mbodj attempted to confront the man, but the man then drew a pistol. Mr. Mbodj jumped aside, and he then saw the man go into and leave the store before running toward the Windbranch Apartments, which were located behind the store. Mr. Mbodj then went back inside the store and noticed that around $130 in $10 and $20 bills was missing.

When asked who robbed the store, Mr. Mbodj replied that the defendant did so. Mr. Mbodj said that he had seen the defendant at the store on three separate occasions on the Saturday, Sunday, and Monday before the robbery, which took place on a Thursday morning. Mr. Mbodj said on one occasion, the defendant had tried to purchase a pack of cigars but was short ten cents. As the defendant was attempting to leave the store that day, Mr. Mbodj accidentally triggered a mechanism that locked the front door, leading to a brief discussion between the clerk and the defendant. The day of the robbery, Mr. Mbodj said that the defendant was wearing a hooded sweatshirt that covered part of his face, and after pushing Mr. Mbodj to the ground, the defendant pulled the strings on his shirt so that the rest of his face was concealed. Although Mr. Mbodj saw only part of the defendant's face, and although Mr. Mbodj did not remember seeing any tattoos, scars, or other identifying features on the robber's body, Mr. Mbodj was certain that the robber was the defendant, whom he had seen at the store on several prior occasions.

On cross-examination, Mr. Mbodj admitted that he only saw the robber's face briefly. When asked if his identification of the defendant as the robber "ha[d] anything to do with the police bringing someone back to the scene," the defendant replied that it did not. On redirect, Mr. Mbodj testified, over defense objection, that he picked the defendant's photograph out of an array he was shown at the police station at 9:25 a.m. the day of the robbery.

Tamera Burnett testified that she had visited the store the morning of the robbery, but had left before it occurred. While standing at a bus stop located across the street from the store, she saw a man, whose face she did not see, run from the store, heading toward the Windbranch Apartments. Ms. Burnett then went to the store and gave Mr. Mbodj her phone so that he could call the police.

After listening to Mr. Mbodj's conversation, in which the clerk gave the police a description of the robber, Ms. Burnett told him that the robber's description "sounded like a guy named Marcus that I knew." Ms. Burnett testified that this individual was her neighbor at the Windbranch Apartments. When the police arrived, she relayed this information to police, and she also told them that Marcus drove a white truck.

Officer Michael Stewart with the Memphis Police Department testified that he arrived at the gas station shortly after the robbery. After interviewing Mr. Mbodj and Ms. Burnett, Officer Stewart broadcast a message to local law enforcement that a black male named Marcus had been seen running from the store toward the Windbranch Apartments, and that he had been known to drive a white Ford Explorer. On cross-examination, Officer Stewart testified that he did not assist in the arrest or apprehension of the suspect.

Officer Ian Barton with the Memphis Police Department testified that after receiving the radio broadcast concerning the suspect, he proceeded to the Windbranch Apartments and began knocking on doors, asking residents for information regarding the suspect and his vehicle. When he knocked on one door, he asked the woman who answered the door if he could enter the apartment and look for Marcus. Officer Barton had the woman, Keisha Taylor, sign a "Consent to Search" form, which was introduced into evidence, "just in case any evidence was found at that location." Officer Barton testified that when he entered the apartment, he noticed several people inside. When he walked toward the back of the apartment, he noticed a man exiting a room. Officer Barton asked the man his name, and the man said it was Marcus. At that point, Officer Barton detained the man, who the officer identified at trial as the defendant, without incident. Officer Barton also testified that he saw a white Ford Explorer near the apartment.

On cross-examination, Officer Barton testified that he apprehended the defendant near the end of his shift, which ended at 7:00 a.m. Officer Barton testified that he searched the defendant incident to arrest, but he found no weapons and no money on the defendant. Officer Barton stated that he did not recall if the police searched the residence for weapons, money, or a hooded sweatshirt. Officer Barton also testified that he did not recall what the defendant was wearing when he was arrested, and the officer also did not remember any "distinguishing features," such as hair style and facial hair, regarding the defendant. The officer also testified that he was not aware if any evidence was retrieved from the defendant's vehicle. The officer also testified that while he searched for the suspect based on the broadcast description of the suspect, the officer could not recall the exact substance of the broadcast at trial.

Jesse Bell, a friend of the defendant, testified that he arrived at the defendant's residence at the Windbranch Apartments between 2:00 and 3:00 a.m. on April 1. Mr. Bell testified that several persons were present at the apartment that night, including him, six of his cousins, and the defendant, who was asleep on a couch by the front door when Mr. Bell arrived. Mr. Bell testified that he went to a back room in the apartment and fell asleep. When he awoke at some time between 5:30 and

6:00 a.m., he saw the defendant walking down a hallway in the apartment. Fifteen to twenty minutes later, Mr. Bell heard a knock on the door. Shortly thereafter, Keisha Taylor, Mr. Bell's cousin, let the police into the apartment. The police asked Mr. Bell who he was; after responding, the police took him outside and placed him in handcuffs. Mr. Bell testified that the police then took him to the 76 gas station near the apartment and asked the clerk if Mr. Bell was the man who had robbed the store. When Mr. Mbodj indicated that Mr. Bell had not robbed the store, the police returned him to the apartment. According to Mr. Bell, the police then "grabbed [the defendant] and they did him the same way."

On cross-examination, Mr. Bell testified that he did not hear anyone leave the apartment during the night. He said that he was sure nobody left because the apartment's front door had been damaged and had to be kept closed at all times, and the back door had been recently damaged so that a person "had to slam it real hard for it to lock. So it was hard for someone to sneak in or out."

The defendant testified that he awoke early on April 1, 2004, because he and other persons in the house would have to go to a temporary labor agency that morning to find work. The defendant testified that he did not remember the exact time he awoke, but that it was "kinda dark, a light little bit" outside. The defendant said that he had arrived at the apartment a few hours earlier following an argument with the mother of his children, and that he did not leave the apartment between that time and his arrest. The defendant noted that he was familiar with the 76 store and with Mr. Mbodj, noting "I know his face and I knew he was a[n] African. . . . basically everybody that worked there was African." The defendant claimed that Mr. Mbodj had identified him as the person who robbed the store because the persons who worked at the gas station had, on several occasions, accused him of crimes that he had not committed, and this accusation was the latest false accusation against him. When asked if he had "been in a little bit of trouble" regarding an assault accusation, the defendant admitted that there was an incident involving the mother of his children, but he claimed that this, too, was a misunderstanding, stating, "I was perceived to put my hands on her, but I didn't. And she told the police that I did." The defendant testified that the police took his white Ford Expedition after he was arrested, but to the best of his knowledge, the police did not recover anything incriminating from the vehicle.

Based on the above evidence, the jury found the defendant guilty of aggravated robbery. The state and the defendant subsequently reached an agreement under which the defendant would be sentenced to eight years in prison as a Range I, standard offender. This appeal follows.

<u>SUFFICIENCY OF EVIDENCE</u>

The defendant contends that the evidence produced at trial was insufficient to support his conviction for aggravated robbery. We disagree.

-4-

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The defendant was convicted of aggravated robbery. Aggravated robbery is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or . . . [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a)(1)-(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). For purposes of the robbery statute, our supreme court has defined "violence" as "physical force unlawfully exercised so as to injure, damage, or abuse." State v. Fitz, 19 S.W.3d 213, 217 (Tenn. 2000).

In this case, the evidence was sufficient to establish the elements of aggravated robbery beyond a reasonable doubt. The victim offered uncontroverted testimony that the assailant initiated the offense by shoving the victim from behind and knocking him onto the ground. The Tennessee Supreme Court in Fitz held that an assailant's act of shoving a victim in an aggressive manner so that the victim loses his balance is sufficient to satisfy the "violence" element of the robbery statute, id., so that element was met in this case. The other two elements were clearly met, as the assailant pointed a gun in the victim's face before taking the money from the store. Therefore, the defendant's main issue in this case is that the victim's identity of the defendant, standing alone, is insufficient to establish that the defendant was the assailant.

This court has held that "the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). This court has consistently held that "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)); State v. Anthony

Williamson, No. W2004-01251-CCA-R3-CD, slip op. at 3 (Tenn. Crim. App. Dec. 30, 2004) (collecting cases). In this case, the victim identified the defendant in a photograph array and in court as the assailant. The victim stated that he was familiar with the defendant through interaction between the two men at the gas station, where the victim worked and the defendant was a regular customer. The victim testified that the defendant was wearing a hooded sweatshirt that partially concealed the assailant's face at the time of the robbery, and that he could not recall identifying features such as scars or tattoos, but the jury, considering these facts along with all other evidence presented, chose to accredit the victim's testimony that the defendant was the assailant and discredit the testimony of the defendant and his alibi witness. Such decisions were within the jury's discretion. See generally State v. Jeffery Yates, No. W2003-02422-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App. July 21, 2005) (jury accredited store clerk's testimony identifying defendant as robber despite the fact that assailant was wearing a mask and victim did not know defendant's name at time of robbery; these facts affected "weight and credibility of [victim's] testimony" and were "issues for the jury's determination, which will not be second-guessed by [an appellate] Court."). Therefore, we deny the defendant relief on this issue.

## ADMISSION OF VICTIM'S IDENTIFICATION OF DEFENDANT

The defendant contends that the trial court erred in admitting evidence that the victim identified the defendant as the person who committed the offense. Specifically, the defendant objects to two "showup" identifications. In the first instance, the defendant was returned to the crime scene shortly after he was apprehended and the victim identified the defendant as the person who committed the offense. In the second instance, the defendant claims that the victim identified him at the police station the day he was apprehended. The defendant argues that the showup identifications tainted the victim's later identifications of the defendant in the photograph array and at trial.

We note that the defendant did not file a pretrial motion to suppress either the photograph identification or the "showup" identifications, did not raise a contemporaneous objection regarding the showup identifications (or their alleged tainting of the victim's later identifications of the defendant as the assailant) at trial, and he did not raise this issue in his motion for new trial.[1] Motions to suppress evidence must be made before trial. See Tenn. R. Crim. P.12(b)(2)(C). "The failure to file a pretrial motion to suppress constitutes a waiver unless good cause for the failure to raise the matter pretrial is timely shown." State v. Zyla, 628 S.W.2d 39, 41 (Tenn. Crim. App. 1981); see Tenn. R. Crim. P. 12(f). In this case, the record indicates that no pretrial motion to suppress was filed, and the defendant has not offered any reason for this failure to file such a motion.

---

[1] The record reflects that the only objection raised by the defendant regarding the victim's identification of the defendant concerned the victim's identification of the defendant in the photograph array. However, the defendant based his objection to this evidence, which was presented by the state during its redirect examination of the victim, on its being beyond the scope of evidence presented on direct examination. The trial court overruled the defendant's objection.

Furthermore, a party's failure to make a contemporaneous objection to trial testimony will typically result in a waiver of the issue on appeal. Tenn. R. App. P. 36(a); <u>State v. Thompson</u>, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Accordingly, the defendant has waived this issue on appeal, and we will not examine the issue for plain error. <u>See</u> Tenn. R. Crim. P. 52(b); Tenn. R. Evid. 103(d).

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE